UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINA GORE-REED,

                Plaintiff,                    Case No. 2:24-cv-11258

v.                                     Honorable Susan K. DeClercq
                                     United States District Judge

BLUE RIBBON RESTAURANTS
NOVI, LLC
d/b/a FAMOUS DAVE'S, a Michigan
corporation,

                Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 17)

Christina Gore-Reed, an African American woman, brings this action against her former employer, alleging racial discrimination, harassment, and retaliation. Now, after the close of discovery, the defendant-employer, Blue Ribbon Restaurants Novi, LLC ("Blue Ribbon"), moves for summary judgment on all claims. Blue Ribbon contends that Gore-Reed cannot establish discrimination, harassment, or retaliation for lack of evidence. Additionally, Blue Ribbon asserts that it had legitimate, non-discriminatory, and non-retaliatory reasons for terminating Gore-Reed's employment, including poor performance, failure to complete training, and poor attendance and tardiness.

This Court will deny Blue Ribbon's motion for summary judgment because a

reasonable jury could find in Gore-Reed's favor on each of her claims. As discussed below, Gore-Reed has presented sufficient evidence to support a hostile work environment claim, and to establish *prima facie* showings of racial discrimination and retaliation. Further, although Blue Ribbon proffers non-discriminatory and non-retaliatory reasons for terminating Gore-Reed, a reasonable jury could find that those reasons were pretext for discriminatory and retaliatory motives.

## I. BACKGROUND

### A.     Work Structure and Supervisory Personnel

Christina Gore-Reed worked as a catering call center specialist for Blue Ribbon Restaurants Novi, LLC from August 2022 to June 2023. ECF No. 18 at PageID.364. Gore-Reed's duties included answering customer calls, providing catering information, and fulfilling catering orders. ECF No. 17-2 at PageID.135. Lindsay Evanson was the direct manager of all the call center specialists, including Gore-Reed. *Id.* at PageID.134. Bridget Wagner, Director of Marketing, served as Gore-Reed's second-level manager. *Id.* at PageID.135; ECF No. 17-9 at PageID.268–69. Two months after hiring Gore-Reed, Blue Ribbon moved to its current "open concept" office in Troy, Michigan. ECF No. 17-3 at PageID.169–70. This office design allowed Gore-Reed to work in close proximity to other call specialists and in the same building as the CEO, CFO, and HR of Blue Ribbon. ECF No. 17-2 at PageID.134–35. CFO Michael Devlin oversaw operations at the Troy

office. ECF No. 17-4 at PageID.200. A few weeks prior to Gore-Reed's termination, Alicia Zanotti was hired as the new HR manager. ECF No. 18-11 at PageID.538.

### B.   Onboarding Process.

In August 2022, Gore-Reed was hired along with another employee, Katherine McKinnon, a biracial African American woman. *See* ECF No. 18-3 at PageID.404, 407. Gore-Reed and McKinnon were the only non-white employees in the call center. *Id.* After only a few months, McKinnon quit, citing in her resignation letter an uncomfortable and unwelcoming environment, favoritism, and disparate treatment regarding who was able to work from home. ECF No. 17-2 at PageID.137–38.

Gore-Reed says that following training, she caught on quickly to the job's duties. ECF No. 18-3 at PageID.427 ("We did over the phone training…. I would say for the most part, I felt that I got the hang of it."). Gore-Reed's role also required proficient use of a software called Caterease. ECF No. 17-2 at PageID.139. Evanson testified that Blue Ribbon requires all call center specialists to undergo a three-week training, culminating in working at an actual catering event to best understand the role. ECF No. 17-2 at PageID.135. According to CFO Devlin, Gore-Reed had not completed her training after nine months into her employment because she had not done an outside event. ECF No. 17-4 at PageID.202. But according to Gore-Reed, she did not know that working an outside event was necessary for completing her

- 3 -

training. ECF No. 18-4 at PageID.454. The call center's specialist schedule indicates that, after five months on the job, on February 6, 2023, Gore-Reed was asked about doing an event and she said she was still not ready to participate in one. ECF No. 18-20 at PageID.673. No other opportunity for Gore-Reed to participate in an outside event is noted in the record.

On October 7, 2022, Wagner sent an e-mail to Evanson detailing McKinnon's and Gore-Reed's progress. ECF No. 17-6 at PageID.230. In the e-mail, Wagner laid out some on-the-job errors that Gore-Reed and McKinnon had made and highlighted a need for additional training for them. *Id.* Wagner requested that Evanson schedule a performance review to "verify their knowledge and skillset." *Id.* Wagner expressed concern that McKinnon and Gore-Reed's progress was slower than others and reasoned it could be due to the company moving, power outages, reduced shifts, or "them leaving constantly or calling off." *Id.*

On January 10, 2023, McKinnon quit. ECF No. 18-20 at PageID.672. She left a letter that stated she did not agree with a warning she received and did not feel as valued as the other employees. ECF No. 18-5 at PageID.462. She also mentioned an uncomfortable and unwelcoming environment, favoritism, and disparate treatment regarding who was able to work from home. ECF No. 17-2 at PageID.137–38. One of her co-workers, Nichole Kahsin expressed that she was glad McKinnon was no longer there, describing McKinnon as an "angry black girl." ECF No. 18-3 at

PageID.420.

## C.   Performance Review

In November 2022, Evanson conducted a review of Gore-Reed's performance. ECF No. 17-7. Evanson says she conducted the review at 90 days, instead of the standard 30, due to "excessive absences and delayed training." ECF No. 17-2 at PageID.139. On the one hand, Evanson's review praised Gore-Reed's customer service skills on the phone. ECF No. 17-7 at PageID.234. But on the other, Evanson recommended that Gore-Reed continue to practice with the Caterease software to "experience a lower percentage of error." *Id.* Evanson also offered additional training resources to Gore-Reed. *Id.* Evanson graded Gore-Reed between "Meets Expectations" and "Work in Progress" for the "Availability and Attendance" prong. *Id.* at PageID.233.

## D.   Attendance.

Within Gore-Reed's performance review, Evanson commented about her attendance. *See* ECF No. 18-6 at PageID.524. Evanson wrote, "[i]n your first 3 months I have recorded numerous call offs. You should continue improving your attendance as I see this already moving in the right direction." *Id.* Blue Ribbon's schedule provides a day-to-day account of which specialists called off, left early, or arrived late. ECF No. 18-20.

As the record appears to demonstrate, Gore-Reed called off at least 26 times,

- 5 -

left early at least 10 times, and was late to work at least 12 times between August 2022 and May 2023. *See* ECF No. 18-20 at PageID.666–676. Lauren Bewley, another specialist, called off at least 8 times, left early at least 22 times, and was tardy at least 8 times. *Id.* Haley Cohen called off at least 12 times, left early at least 20 times, and was late at least 3 times. *Id.*

Notably, that tally differs from Blue Ribbon's calculations. As set forth in a table in its reply brief, Blue Ribbon provides the following tally for that same period:

| Representative | Called off Work | Cut Early/Asked to Leave Early[1] | Late for Work |
|---|---|---|---|
| Gore-Reed | 33 | 9 | 21 |
| Bewley | 10 | 16 | 6 |
| Cohen | 12 | 8 | 2 |
| Kahsin | 5 | 5 | 3 |
| Rew | 2 | 5 | 0 |

ECF No. 19 at PageID.683 (citing ECF No. 18-20).

### E.    Laptops and Remote Work.

Gore-Reed was not provided with a laptop, which made it so she was unable to work from home. ECF No. 18-3 at PageID.427 She says that the white specialists—Bewley, Cohen, and Kahsin—were given laptops or remote access, but the African American specialists–Gore-Reed and McKinnon–were denied both options. *Id.* According to Blue Ribbon, full-time laptops were given based on

---

[1] This count by Blue Ribbon does not appear to differentiate between instances when Blue Ribbon asked employees to leave early versus when employees requested to leave early, which seems significant here.

seniority, thus, Gore-Reed and McKinnon simply were given desktops instead because they were new hires. ECF No. 17-2 at PageID.138.

The specialist schedule shows that McKinnon and Gore-Reed were given a paid day off in October 2022 while the company was moving offices because "they [were]n't ready to work from home." ECF No. 18-20 at PageID.669; *see also* ECF No. 17-9 at PageID.282. The schedule also remarks that Gore-Reed was "no longer allowed to WFH" on December 23, 2022. ECF No. 18-20 at PageID.671. But on January 26, 2023, Evanson offered Gore-Reed the opportunity to work from home after a medical procedure, but Gore-Reed called off instead. ECF Nos. 17-8 at PageID.258; 18-20 at PageID.672. Gore-Reed and Blue Ribbon agree that there was a laptop available for any employee to take home on the weekends. ECF No. 17-3 at PageID.193. But Gore-Reed says that the weekend laptop offered to her was outdated, poorly working, and barely usable. ECF No. 18-4 at PageID.454.

### F.    Workplace Incidents and Complaints

Starting in October 2022, Gore-Reed states her white co-workers began to mock and ridicule African American customers, including by displaying at least six or seven pictures of them with crude, racially insensitive speech bubbles attached. ECF Nos. 18-4 at PageID.454; 18-3 at PageID. 406, 409, 418. One picture may have been of a customer who was not African American. ECF No. 18-3 at PageID.409; *see also* ECF No. 17-8 at PageID.253. Gore-Reed also testifies that her co-worker,

Nichole Kahsin, would make racially insensitive comments to her directly, including comments about her hair. ECF No. 18-3 at PageID.411, 418, 420. Gore-Reed also testified her white co-workers used African American slang, mocked perceived African American speech patterns, constantly commented about Gore-Reed's hair, and referred to multiple delivery locations as ghetto. ECF No. 18-3 at PageID.411, 418.

Gore-Reed says she first complained to Evanson about racially insensitive comments in December 2022.  ECF No. 18-3 at PageID.418. But she says Evanson never addressed these concerns in a meeting or otherwise. *Id.* at PageID.421.

Gore-Reed says her co-workers then began to "sabotage" her work in response to her complaints about them. ECF NO. 18-3 at PageID.419. This included changing Gore-Reed's notes in Caterease and fabricating notes in her name. *Id.* She says that her co-workers began to shun her as well. *See id.* at PageID.421 ("No one would talk to me and things of that nature."). On March 28, 2023, the schedule notes that Gore-Reed was having issues with Kahsin. ECF No. 18-20 at PageID.674. It says that Gore-Reed "arrived unwilling to work until she vented" about feeling isolated and left out at work. *Id.* According to Evanson, Gore-Reed's complaints did not mention race and instead focused on the poor working relationship between Gore-Reed and Kahsin. ECF No. 17-2 at PageID.144. Evanson met with both employees separately to address the issue. *Id.*

On May 26, 2023, Gore-Reed says her co-workers falsely accused her of taking a customer's credit card slip, causing Gore-Reed to become emotional and express her feelings of discrimination. ECF No. 18-3 at PageID.421–24; ECF No. 18-10 at PageID.536. Evanson sent Gore-Reed and others home early. *Id.* at PageID.424; ECF No. 17-2 at PageID.151. That night, Gore-Reed sent Evanson a text message and mentioned "go[ing] to the EEOC." ECF No. 18-9 at PageID.553. Evanson states she drafted an Employee Warning Documentation for Gore-Reed, which she dated May 26, that included notes about Gore-Reed's attendance and performance issues from prior documents. ECF Nos. 18-16; 18-5 at PageID.484–85. The document, however, may not have been actually drafted until June 1. ECF Nos. 18 at PageID.374; 18-16 at PageID.632 (showing document was created June 1, 2023, at 2:30 PM); 18-18 at PageID.660 (Blue Ribbon clarifying that document was drafted on June 2, 2023).

By e-mail, Evanson collected employee statements about the May 26 incident, including one she prepared herself, which mentioned that Gore-Reed was threatening to contact a lawyer about a discrimination claim. ECF Nos. 18-5 at PageID.476; 18-10 at PageID.536. Evanson requested a statement from Gore-Reed, but Gore-Reed responded that she would rather send it to HR or the CEO. ECF No. 18-9 at PageID.553 (the actual text messages). Evanson documented Gore-Reed's response as a refusal to provide a statement. ECF No. 18-5 at PageID.484.

CFO Devlin reviewed the statements and planned to meet with Gore-Reed on May 30, 2023, to discuss the incident and her performance. ECF No. 17-4 at PageID.202. In the meantime, Evanson and Wagner, Evanson's supervisor, were tasked with gathering information regarding Gore-Reed's performance and attendance and presenting it to Devlin over the weekend. ECF Nos. 18-5 at PageID.473; 17-4 at PageID.205. Gore-Reed, however, did not come to work May 30 due to car troubles, so Devlin decided he would terminate her employment instead. ECF No. 17-4 at PageID.204. However, he did not send the e-mail immediately, wanting instead to wait to terminate Gore-Reed in person. *Id.*

## G.    Complaint to CEO and Response

On the evening of May 30, 2023, Gore-Reed e-mailed Baum, Blue Ribbon's CEO. ECF No. 18-14. She detailed her concerns about her work environment. *Id.* Because of this email, Devin decided to delay Gore-Reed's termination and investigate her claims. ECF No. 17-4 at PageID.204. Blue Ribbon's HR department then conducted a "formal investigation" on May 31st and June 1st. ECF No. 17-8 at PageID.237. The investigation consisted of interviews with Evanson, Wagner, and the other call center specialists, all of whom "stated that they have never made racially insensitive comments or mocked African American culture or customers." *Id.* They also denied bullying or sabotaging Gore-Reed. *Id.* at PageID.238. As well as speaking to those employees, the HR department also asked other departments

located in the office "if they ha[d] ever heard racial comments/jokes from the call

center," and all department reported never overhearing such comments. *Id.*

Ultimately, the investigation produced a written report dated June 5, 2023.

ECF No. 17-8 at PageID.249–253. The findings of that report are restated, in full,

here:

> At the conclusion of the investigation, it was found that Christina's claims of enduring a racially hostile work environment and being treated differently than the other employees are unsubstantiated. HR did not find any evidence during this investigation that supports this claim. Christina was offered multiple chances to complete her training by Lindsay, to which Christina declined this. Christina was aware that she was not eligible to work from home until she completed her training. Lindsay demonstrated (with photographic evidence of text messages) that she has always been kind, supportive and accommodating towards Christina. It was found that the Catering Call Center employees do engage in light humor regarding difficult customers. None of these comments were found to be racists or offensive. HR has still instructed Lindsay to discourage this behavior in the future and take corrective action if it continues after a warning.
>
> Of note Christina never approached HR with these concerns prior to termination.

*Id.* at PageID.253.

In the meantime, Gore-Reed says that soon after she sent her e-mail to Baum,

Bewley alerted her to a Facebook post made by Evanson. ECF Nos. 18-3 at

PageID.412; 17-14. As shown in the screenshot provided by Gore-Reed, the text of

that post in full is as follows:

> This nappy head b**** filed a complaint against me I have never in my 15 yrs have ever dealt with such a b**** that makes up shit about me I

feel so humiliated how dare you.

ECF No. 18-19.

Evanson denies making this post and alleges that it is doctored, providing records from Facebook that Blue Ribbons views as corroborating her account. ECF Nos. 18-5 at PageID.485; 17-15 (Facebook "metadata" log).

## H.   Termination and Lawsuit

On June 1, 2023, Alicia Zanotti terminated Gore-Reed via email, citing excessive absences and poor performance. ECF No. 17-13. After her termination, Gore-Reed avers that Bewley informed her of a meeting that occurred with the remaining specialists during which management instructed Kahsin and Cohen "to take down the customer photos in their cubicles." ECF No. 18-4 at PageID.455.

Gore-Reed filed a discrimination charge with the EEOC in October 2023. ECF No. 2 at PageID.10. The EEOC issued her a right-to-sue letter on May 13, 2024. *Id.* Later that same day, Gore-Reed sued Blue Ribbon. ECF No. 1. Gore-Reed amended her complaint the same day. ECF No. 2.

As stated in her amended complaint, Gore-Reed asserts race discrimination under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). ECF No. 2 at PageID.13. Gore-Reed also asserts a count of retaliation under the same statutes. *Id.* at PageID.14. In May 2025, Blue Ribbon moved for summary judgment, ECF No. 17, which was fully

briefed, ECF Nos. 18;19. A hearing on the motion is not necessary. *See* E.D. Mich. LR 7.1(f)(2).

## II. LEGAL STANDARDS

As set forth in Civil Rule 56(a), courts may only grant summary judgment where "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343 (6th Cir. 2021). When deciding whether a genuine issue of material fact exists, courts must "view the facts in the record and the reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party," *id.*, which in this case is Gore-Reed. This means that the determination is to be made without judging credibility or weighing conflicting evidence. *See Briggs v. Univ. of Cin.*, 11 F.4th 498, 507 (6th Cir. 2021). A fact is "material" if it affects the action's outcome, and an issue is "genuine" if "a reasonable trier of fact could return a verdict for the nonmovant." *Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002).

At the summary judgment stage in indirect-proof cases like this, courts apply the same three-part, burden-shifting framework for racial discrimination and retaliation claims under Title VII, § 1981, and the ELCRA. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802–05 (1973) (articulating framework); *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 824–25 (E.D. Mich. 2009) (collecting cases

- 13 -

and applying *McDonnell Douglas* standard); *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the Elliot-Larsen Act under the same standards as claims of race discrimination brought under Title VII of the Civil Rights Act of 1964."). First, a plaintiff must make a prima facie case of discrimination or retaliation. *See In re Rodriguez*, 487 F.3d 1001, 1008–11 (6th Cir. 2007) (applying *McDonnell Douglas* framework to employment discrimination and retaliation claims). The burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory, and non-retaliatory reason for the adverse employment action. *Id.* at 1008. Finally, the burden shifts back to the plaintiff to rebut the employer's proffered rationale by showing that it was pretextual. *Id*.

Unlike Gore-Reed's discrimination and retaliation allegations, her claim of harassment via a hostile work environment does not proceed along the three-part *McDonnell Douglas* framework. Instead, the claim is assessed in a more straightforward matter whereby Gore-Reed need only present evidence satisfying five elements, as set forth below. *See Curry*, 669 F. Supp. 2d at 833.

### III. DISCUSSION

#### A. Racial Harassment: Hostile Work Environment

Blue Ribbon argues that Gore-Reed's racial harassment claims must be dismissed because she has failed to provide evidence that harassing conduct was

sufficiently severe or pervasive enough to create an abusive working environment and that it was unaware of race-based harassment, or alternatively, it took reasonable action in response.  This Court disagrees.

To establish a prima facie case of racial harassment based on a hostile work environment under Title VII and the ELCRA, Gore-Reed must show: "(1) [s]he belongs to a protected group; (2) [s]he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment[;] and (5) defendant knew or should have known about the harassment and failed to take action." *Curry*, 669 F. Supp. 2d at 833 (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078–79 (6th Cir. 1999)).

Blue Ribbon does not dispute the first three elements: that Gore-Reed is African American, that she suffered some harassment, and that the harassment was related to her race. *See* ECF No. 17 at PageID.119–24. Accordingly, this Court will evaluate only the fourth and fifth elements.

### 1. *The harassment possibly affected a term, condition, or privilege of employment*

Blue Ribbon argues that the harassing conduct alleged by Gore-Reed was not sufficiently severe or pervasive enough to create an abusive working environment. ECF No. 17 at PageID.120–22.

When assessing a hostile work environment claim, courts "look at the totality of the alleged harassment to determine whether it was sufficiently severe or

- 15 -

pervasive to alter the conditions of a plaintiff's employment and create an abusive working environment." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (citation modified). Circumstances to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citation modified). "Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

The Sixth Circuit has held that plaintiffs alleging hostile work environment claims face a "high bar," noting that, for example, "in the context of alleged racial discrimination, … even offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements." *Khalaf*, 973 F.3d at 482–83 (citation modified). What this means is that "occasional offensive utterances do not rise to the level required to create a hostile work environment because, to hold otherwise would risk changing Title VII into a code of workplace civility." *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (internal quotation omitted); *see also Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014) (affirming summary judgment granted

in employer's favor on hostile work environment claim where the plaintiff was subjected to offensive, race-based comments and his supervisor stood behind him and made a noose with a phone cord). With these principles in mind, this Court turns now to the parties' arguments.

Blue Ribbon compares the comments made in this case to the "inappropriate and racially insensitive comments and conduct" that the Sixth Circuit has held did not meet the severe or pervasive standard in other cases. *Id.* at PageID.121–22 (citing *Woods v. FacilitySource, LLC*, 640 F. App'x 478 (6th Cir. 2016)). Such comments include referring to African Americans as "you people," describing African Americans as "dramatic" and "cheeky," and asserting that African Americans enjoy "fried chicken and Kool-Aid." *Id.* at PageID.122.

However, viewing the evidence in a light most favorable to Gore-Reed, as this Court must on a motion for summary judgment, there is sufficient evidence from which a jury could conclude that the harassment was not limited to "a few isolated events," but rather was "'day to day'; 'constant'; and 'all the time.'" ECF No. 18 at PageID.379 (citing ECF No. 18-3). KahsinFor example, Gore-Reed alleges that Kahsin mockingly spoke to her using "African American verbiage" "every day" when speaking to Gore-Reed and that her white co-workers always had an issue with her hair. ECF No. 18-3 at PageID.418, 420. She also points to a practice started by Evanson whereby her white co-workers would collect, share, and display around the

- 17 -

open-floor office images of African American customers with speech bubbles referring to the customers as, among other descriptors, "nappy hair" and "fair-skinned b*****." ECF No. 18 at PageID.368–69 (citing ECF No. 18-3).

This conduct by Gore-Reed's white co-worker was repeated across multiple instances, was widespread throughout her workplace where she had to confront it, and occurred across a range of months. *Cf. id.* at 319–20 (noting that workplace was plagued with highly offensive, racist graffiti and sexually explicit drawings with racial components," and that plaintiff was frequently subjected to slurs and derogatory comments); *Hawkins v. Anheuser-Bush, Inc.*, 517 F.3d 321, 334–35 (6th Cir. 2008) (holding that genuine issue of material fact precluded grant of summary judgment where plaintiffs testified to ongoing acts of sexual harassment, including crude solicitations for sex, invasions of personal space, and physical contact). Thus, this resembles the "ongoing, commonplace, and continuous" sort of conduct that the Sixth Circuit has held meets the severe and pervasive standard. *See Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 318, 324–27 (6th Cir. 2010) (reversing summary judgment grant where a genuine issue of material fact existed as to whether the alleged racial harassment was sufficiently severe and pervasive to alter conditions of employment in case involving continual racial epithets spoken and posting of racial graffiti at their workplace).

  *2. Blue Ribbon may have known about the harassment and failed to take action.*

Blue Ribbon next contends that there is no basis for employer liability because Blue Ribbon was not aware of race-based harassment and took appropriate action to address Gore-Reed's concerns. ECF No. 17 at PageID.122–124. On this point, Blue Ribbon asserts that "at no point did [Gore-Reed] report racially harassing or discriminatory behavior to Blue Ribbon's human resources, Devlin himself or anyone else." *Id.* at PageID.123. Instead, it characterizes Gore-Reed's complaints "merely of rudeness by her coworkers, which is not unlawful." *Id.* Blue Ribbon further presses that it took action on Gore-Reed's complaints, including through Evanson speaking to Kahsin "on several occasions" and Evanson sitting in the call center area "to observe their behavior and deter alleged poor behavior." *Id.* at PageID.123–24.

However, the record contains evidence that Gore-Reed regularly complained to Evanson—her direct supervisor—and others that her work environment was racially hostile. *See, e.g.*, ECF No. 18-3 at PageID.418 (testifying that she complained to Evanson about Kahsin's mocking use of perceived African American speech patterns and Kahsin's derogatory comments regarding her hair).. For example, Gore-Reed says that she complained to Evanson as early as December 2022, complained to her second-line supervisor, and even complained to the CEO just days before her termination. *See* ECF No. 17-12. Also, to the extent that Evanson sat in the call center area among images of African American customers with speech

- 19 -

bubbles referring to the customers as, among other descriptors, "nappy hair" and "fair-skinned b*****," a reasonable jury could find that Evanson was aware that Gore-Reed's concerns were related to race.   *Id.* at PageID.381 (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1079 (6th Cir. 1999) (holding that a reasonable jury could find a racially hostile work environment where plaintiff's supervisor witnessed a co-worker call plaintiff a "n****r")).

Blue Ribbon's argument that it took action on Gore-Reed's complaints is more compelling than its argument on the previous element. Indeed, Gore-Reed does not expend much ink challenging this assertion, simply arguing in conclusory fashion that "Evanson … took no, or certainly no effective, action." ECF No. 18 at PageID.381.

But, like the issue of Blue Ribbon's awareness, this argument is unavailing all the same. Despite Evanson's testimony that she admonished Kahsin and sat in the call center to deter additional abuse, there is evidence that Evanson may have made a Facebook post referring to Gore-Reed as "a nappy head b**** … who filed a complaint against me." ECF No. 18-9. Although the authenticity of this post is in dispute, a reasonable jury could question whether one alleged harasser sitting in among other alleged harassers is a response that "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins v. Anheuser-Busch*, 517 F.3d 321, 338 (6th Cir. 2008) (quoting *Blankenship*

*v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872–73 (6th Cir. 1997)). It is also particularly notable that after Gore-Reed complained to Evanson about an incident where a white co-worker said to McKinnon that "a Black person made hot sauce" because "Black people love hot sauce," Evanson disciplined only McKinnon, an African American employee. ECF No. 18-3 at PageID.407–08. But more importantly, Gore-Reed has presented evidence that her colleagues continued to harass her and began sabotaging her work after she complained and that nothing was done to stop this continued hostility. *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1188–89 (10th Cir. 2007) (holding that a reasonable jury could find that employer's corrective action was insufficient where harassment continued afterwards); *see also Garcia v. Los Banos Unified Sch. Dist.*, 418 F. Supp. 2d 1194, 1227 (E.D. Cal. 2006) (concluding that there was a genuine issue of material fact as to whether employer took reasonably measured corrective action where harassment continued after employer's intervention and noting that "[i]t is for the trier of fact to decide the adequacy and significance of the employer's conduct."); *McDaniel v. Fulton Cnty. Sch. Dist.*, 233 F. Supp. 2d 1364, 1383 (N.D. Ga. 2002) ("Furthermore, plaintiff's allegations that [co-workers] continued to harass her even after she filed formal complaints … create a genuine issue of material fact as to whether the County Defendants took prompt remedial action after the plaintiff filed a formal complaint of harassment."). Thus, this Court concludes that genuine issues of material fact exist

as to whether Blue Ribbon knew or should have known about the harassment and whether Blue Ribbon failed to take "prompt and appropriate corrective action." *Id.* Summary judgment, therefore, is inappropriate as to Gore-Reed's hostile work environment claim.

### B.    Racial Discrimination: Prima Facie Case

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). To establish a prima facie case of racial discrimination via disparate treatment, a plaintiff must show that "(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was ... treated differently than similarly situated non-protected employees." *Curry*, 669 F. Supp. 2d at 825 (quoting *Russell v. Univ. of Tol.*, 537 F.3d 596, 604 (6th Cir. 2008)) (citation modified). Here, the parties agree that Gore-Reed has made a showing as to the first two elements since she is an African American woman and her employment was terminated. But Blue Ribbon disputes the third and fourth elements.

*1. A reasonable jury could find that Gore-Reed was qualified for her position.*

Blue Ribbon argues that Gore-Reed was not qualified for the call center specialist position. ECF No. 17 at PageID.119. Her lack of qualification, Blue

Ribbon argues, is evidenced by her "poor attendance and performance." *Id.* It is also evidenced, Blue Ribbon proceeds, by her failure to complete the required training. *Id.*

However, at this summary judgment stage, this Court "must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge." *Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 585 (6th Cir. 2002); *see also Cline v. Cath. Diocese of Tol.*, 206 F.3d 651, 661 (6th Cir. 2000) (warning that doing otherwise risks "improperly conflating the distinct stages of the *McDonnell Douglas* inquiry"). Therefore, at this stage in the *McDonnell Douglas* inquiry, this Court may not consider Blue Ribbon's argument that Gore-Reed was unqualified as evidenced by the performance, attendance, and tardiness issues that it says ultimately cost her the job.

This leaves a record where Gore-Reed indisputably had 10 years of experience in customer service prior to working for Blue Ribbon. ECF No. 18-4 at PageID.453. Also, Evanson praised her customer service skills in a positive evaluation and later testified that Gore-Reed's performance was fine. ECF No. 17-7 at PageID.234. These two considerations tilt squarely in Gore-Reed's favor. *See Cicero*, 280 F.3d at 585–86 (emphasizing plaintiff's "extensive background in human resources management" and the "good evaluations" plaintiff received during his employment).

And although Blue Ribbon contends that Gore-Reed was unqualified because

she did not complete her training, this consideration does not tilt strongly enough against Gore-Reed to merit summary judgment. Merely having one uncompleted component of her training—attendance at a live catering event—does not appear to have stopped her from performing the job. Thus, on the record before this Court as limited by *Cline* and *Cicero*, a reasonable jury could conclude that Gore-Reed was qualified for purposes of a prima facie showing of discrimination.

### 2. A reasonable jury could find that Gore-Reed was treated differently than similarly situate white peers.

Blue Ribbon also contends that Gore-Reed was not treated differently than similarly situated, non-protected employees. ECF No. 17 at PageID.117–118. Blue Ribbon points out that any differences were due to "legitimate business decision[s]" rather than discriminatory motives. *Id.* at PageID.118. For instance, Blue Ribbon points out that Gore-Reed and McKinnon were not given laptops to work from home because of resource limitations and seniority; they simply were the last two call center employees hired at the time, and there were no more weekday laptops to allocate at that time. *Id.* at PageID.118. Blue Ribbon also asserts that, although other employees were allowed to work from home, Gore-Reed was not because she had not completed her training. *Id.*

Two issues cut against Blue Ribbon's position. First, Evanson told Gore-Reed that she was "working on" getting her a laptop, ECF No. 18-3 at PageID.428, but one was never provided for over nine months thereby casting doubt as to Blue

Ribbon's seniority explanation. ECF No. 18 at PageID.383. This is remarkable because Blue Ribbon does not allege an inability to secure a laptop over that nine-month span. Second, the record does not indicate that any of Gore-Reed's white peers' attendance or tardiness was scrutinized or disciplined. To be sure, Blue Ribbon attributes that difference in treatment to the different frequency with which the employees called off, noting that "no other employee missed nearly as much time as [Gore-Reed] during the first nine months of her employment." ECF No. 17 at Page ID.118. That may be correct, but whether Gore-Reed's white peers suffered from reasonably similar issues with respect to their attendance and tardiness involves a tricky line-drawing question that juries are well-equipped to handle. Given either of the tallies calculated above, this Court concludes that a reasonable jury could find that Gore-Reed's white peers suffered from sufficiently similar attendance and tardiness issues despite calling off, leaving early, and showing up late less often. *See* ECF No. 18-20 at PageID.666–76 (schedule); *see also* ECF No. 17 at PageID.683 (Blue Ribbon's tally). Thus, the delay in securing Gore-Reed a laptop and the difference in treatment between at least arguably similar employees creates a genuine issue of material fact for a jury to decide.

With those four elements met, Gore-Reed has established a prima facie case of racial discrimination via disparate treatment. That precludes summary judgment at this step of the *McDonnell Douglas* framework.

## C.   Retaliation: Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff bears the burden of establishing four elements: "(1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health* Sys., 897 F.3d 763, 775 (6th Cir. 2018) (citation modified); *see also Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (describing the burden as a "burden of production"); *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) ("That is a burden easily met."). Here, Blue Ribbon disputes only the first and fourth elements.

### 1. Gore-Reed showed that she engaged in a protected activity.

First, Blue Ribbon argues that Gore-Reed has not established that she engaged in a protected activity. Specifically, Blue Ribbon contends that "[Gore-Reed] speaking to Evanson regarding Kahsin did not constitute protected activity for purposes of a retaliation claim" because "there is no evidence that this conversation involved or was directed at [Gore-Reed] or her race." ECF No. 17 at PageID.125.

This argument lacks merit. "Protected activity," for purposes of a retaliation claim, can include an internal "complaint to management about discriminatory employment practices" so long as it goes "beyond a vague charge of discrimination."

*Kovacs v. Univ. of Tol.*, 711 F. Supp. 3d 697, 706 (N.D. Ohio 2024) (citing *Jackson*, 999 F.3d at 344–45) (citation modified). As for what such a complaint must be directed at, the Sixth Circuit has clarified that "opposing any practice that the employee reasonably believes to be a violation of Title VII" amounts to protected activity. *Johnson v. Univ. of Cin.*, 215 F.3d 561, 579 (6th Cir. 2000).

Gore-Reed testified that she did just that. As early as December 2022, Gore-Reed complained to Evanson about racial harassment. *See* ECF No. 18-3 at PageID.418 (testifying that she complained to Evanson about Kahsin's mocking use of perceived African American speech patterns and Kahsin's derogatory comments regarding her hair). And as late as May 30, 2023—just two days before her termination—Gore-Reed e-mailed Blue Ribbon's CEO complaining of racial discrimination and harassment. ECF No. 17-12 (explaining that "[r]acism definitely has been the biggest issue I have experienced" and raising concerns about "discrimination" and a "hostile work environment"). The content of her complaints is also reflected in notes that Evanson took on May 26th memorializing threats by Gore-Reed to contact a lawyer about a discrimination claim. ECF No. 18-10 at PageID.536 ("Christina is threatening to hire a lawyer and has been collecting evidence of being discriminated against."). All of this occurred within one week before her termination on June 2, 2023. Thus, there is, at minimum, a genuine question of material fact as to whether Gore-Reed engaged in protected activity.

*2. Gore-Reed established a causal nexus between her complaints and termination.*

Next, Blue Ribbon argues that Gore-Reed has not established a causal connection between the protected activity and her termination. ECF No. 17 at PageID.125–26. This argument falls flat for two reasons.

Most notably, the timing here gives rise to a reasonable inference that Gore-Reed's complaint was, at least in part, cause for her termination. *See Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009) ("Causation can be proven indirectly through circumstantial evidence such as suspicious timing."); *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("In those limited number of cases [] where an employer fires an employee immediately after learning of a protected activity, we can infer a causal connection between the two actions, even if [plaintiff] had not presented other evidence of retaliation."). Recall, after experiencing yet another instance of harassment on May 26th, Gore-Reed e-mailed the CEO on May 30th, ECF No. 18-14, and Blue Ribbon terminated her less than two days later on June 1st, ECF No. 17-13. *Cf. DiCarlo v. Potter*, 358 F.3d 408, 421–22 (6th Cir. 2004) (holding that 21-day period between protected activity and termination was "significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive"); *Handy-Clay v. City of Memphis*, 695 F.3d 531, 546 (6th Cir. 2012) ("[T]he chronology of events supports an inference of causation, particularly because [plaintiff] was terminated

- 28 -

the day after she made her own records requests."); *see also Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 310 (6th Cir. 2023) ("[I]f the act occurs within "days or weeks" of the speech, the close proximity can sometimes (if rarely) permit an inference that the one motivated the other.").

Further, under a "cat's paw" theory—by which a biased supervisor's discriminatory or retaliatory animus can be attributed to a decision-maker in certain circumstances—a reasonable jury could consider Evanson's Facebook post (lamenting a "nappy head b****" who filed a complaint) as evidence of a causal connection between the complaint and Gore-Reed's imminent termination. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 377–78 (6th Cir. 2017) (discussing application of cat's paw theory to employment discrimination and retaliation claims). To be sure, Blue Ribbon contends that this post was fabricated. ECF No. 17 at PageID.114. But this Court may not make credibility determinations and must view disputed facts in a light most favorable to Gore-Reed as the non-moving party. *See Jackson*, 999 F.3d at 343; *Briggs*, 11 F.4th at 507.

Therefore, a genuine issue of material fact exists as to whether there existed a causal connection between Gore-Reed's protected activity and her subsequent termination. Thus, with showings made as to each element, summary judgment is improper at this stage of the *McDonnell Douglas* framework.

### D.    Legitimate Business Reasons and Pretext

With the prima facie cases for discrimination and retaliation established, the burden shifts to Blue Ribbon to articulate a legitimate, non-discriminatory, and non-retaliatory reason for terminating Gore-Reed. *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 824 (E.D. Mich. 2009) . In its briefing, Blue Ribbon provides several such reasons, including poor performance, failure to complete training, poor attendance, and tardiness. ECF No. 17 at PageID.126. Gore-Reed does not dispute that Blue Ribbon's articulated rationales meet its burden at this stage of the *McDonnell Douglas* framework. *See generally* ECF No. 18.

Consequently, the burden shifts back to Gore-Reed to show that the proffered reasons were pretextual. *Curry*, 669 F. Supp. 2d at 824. To meet that burden, Gore-Reed must "must produce evidence that either the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd*, 552 F.3d at 502. Blue Ribbon argues that Gore-Reed has failed to do so. ECF No. 17 at PageID.127.

The record, however, is rife with evidence from which a reasonable jury could conclude that Blue Ribbon's proffered reasons were pretextual. To start, there is evidence that Blue Ribbon's proffered reasons are duplicitous. For example, there is a question about whether Evanson and Wagner "concocted an 'Employee Warning Documentation' which they backdated to May 26, 2023 (pre-termination)." ECF Nos. 18 at PageID.364; 18-16. Indeed, metadata for the Word version of the

document showed it was created and last edited on June 1—not May 26, as written. ECF Nos. 18-16; 18-5 at PageID.484–85 (admitting to backdating the document). A reasonable jury could view this backdating as an attempt at damage control by retroactively producing documentary support for the termination. *See Kelly v. Acct. Control Techs., Inc.*, No. 1:17-cv-320, 2018 WL 4005597, at *6 (S.D. Ohio Aug. 22, 2018) (concluding plaintiff had made preliminary showing of pretext where plaintiff "offered evidence that [director of operations] had asked him to falsify and backdate documents so that [employer] could terminate a colleague who had been diagnosed with cancer before she could take FMLA leave for cancer treatment"). Additionally, such a jury could draw the same inference from the inaccuracies in Zanotti's testimony. Zanotti, for example, testified that Gore-Reed had received two prior warnings for attendance prior to her termination, ECF No. 18-11 at PageID.543. *But see* ECF Nos. 17-2 at PageID.149 (Evanson testifying that there were no written warnings given to Gore-Reed about her performance). Thus, a reasonable jury could find that Blue Ribbon's decision-makers are not credible with respect to their reasons for Gore-Reed's termination.

A reasonable jury could also find that Blue Ribbon's reasons are simply not credible in their own right—or, in other words, that the proffered rationale does not hold up to scrutiny. *See Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 714 (6th Cir. 2007) ("One way in which a plaintiff may demonstrate pretext is by showing

- 31 -

that the reason given by the employer is ultimately found to be mistaken, foolish, trivial, or baseless." (internal quotation marks omitted)). Blue Ribbon's stated concerns with Gore-Reed's performance, attendance, and tardiness are at least arguably inconsistent with Gore-Reed's performance reviews and Evanson's subsequent evaluation. Recall, Evanson graded Gore-Reed between "Meets Expectations" and "Work in Progress" for the "Availability and Attendance" prong. ECF No. 18-6 at PageID.522. In that performance review, Evanson noted "Your phone work and interaction with guests is wonderful. You have a smile on 100 percent of the time and have a knack for customer service." *Id.* at PageID.524. Of the 11 assessment categories, Evanson graded Gore-Reed as either "Meets Expectations" or "Work in Progress" for 9, and "Action Required" for only 2 items, which the review itself conceded "take time to learn." *Id.* at PageID.521–22. Evanson also later testified that Gore-Reed was a valuable employee who "helped control the catering executions, [] helped control our ability to make sales, [and] participated in our daily tasks." ECF No. 18-5 at PageID.464. Lastly, CFO Devlin testified that he decided to terminate Gore-Reed at least in part because there was "nobody else in the company that was missing work as much as her," ECF No. 17-4 at PageID.201, but he also conceded that he did not "compare her record to the other call center specialists with respect to days off or call offs or late arrivals or early departures," *id.*

In addition, Blue Ribbon's actions and inactions regarding employee discipline could further support a reasonable jury finding that Blue Ribbon's proffered reasons are pretextual. First, Blue Ribbon appears to have not followed its own internal progressive disciplinary policy under which intermediate, less severe disciplinary action could and possibly should have been pursued before terminating Gore-Reed for her attendance and tardiness, including a verbal or written warning for the first violation and a suspension for the second violation. *See* ECF Nos. 18-5 at PageID.469; 17-16 at PageID.335. Second, Blue Ribbon did not terminate or otherwise take adverse employment action against Gore-Reed's white peers, Bewley and Cohen, both of whom a reasonable jury could find similarly struggled with attendance and tardiness. *See* ECF No. 18-20 at PageID.666–676. The Sixth Circuit has held that this can support a finding of pretext. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020) ("We have held that failure to uniformly apply a progressive discipline policy can be evidence of pretext, especially when the company asserts that policy as a rationale for the employee's termination.").

In light of these considerations, this Court concludes that a genuine issue of material fact exists as to whether Blue Ribbon's proffered reasons for terminating Gore-Reed were pretextual. *See Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) ("[A] prima facie case and a showing of pretext can support a jury verdict for

the plaintiff."). Because Gore-Reed has made out prima facie cases of discrimination and retaliation, this genuine issue of material fact precludes summary judgment on both her discrimination and retaliation claims. *See id.*

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 17, is **DENIED**.

**This is not a final order and does not close the above-captioned case.**

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: November 12, 2025

- 34 -